

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-12-1999

# USA v. Robinson

Precedential or Non-Precedential:

Docket 98-3304

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA v. Robinson" (1999). *1999 Decisions.* Paper 39.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/39

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 12, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-3304

UNITED STATES OF AMERICA

v.

MELVIN ROBINSON, a/k/a Sweets

Melvin Robinson,
        Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Crim. No. 97-64)
District Judge: Hon. Alan N. Bloch

Argued January 12, 1999

BEFORE: GREENBERG and SCIRICA, Circuit Judges,
and CARMAN,* Chief Judge, Court of International Trade

(Filed: February 12, 1999)

        Thomas Livingston (argued)
        The Colonial Building
        205 Ross Street
        Pittsburgh, PA 15219

         Attorney for Appellant

_____

*Honorable Gregory Carman, Chief Judge of the United States Court of
International Trade, sitting by designation.

Harry Litman
United States Attorney
Bonnie R. Schlueter (argued)
Assistant United States Attorney
633 United States Post Office &
Courthouse
Pittsburgh, PA 15219

Attorneys for Appellees

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

On July 24, 1997, a jury in the Western District of
Pennsylvania found the defendant, Melvin Robinson, guilty
of conspiring to distribute heroin in violation of 21 U.S.C.
S 846 contrary to 21 U.S.C. SS 841(a)(1) and 841(b)(1)(C).
After conducting a hearing, the district court sentenced
Robinson to the mandatory 20-year minimum term
required by 21 U.S.C. S 841(b)(1)(C) ("section 841(b)(1)(C)")
when "death or serious bodily injury results from the use
of" the substance the defendant was convicted of
distributing.

On appeal, Robinson does not challenge the jury'sfinding
of guilt. Thus, he does not argue that the evidence did not
support a finding that he conspired to distribute heroin.
Instead, he argues that venue was improper, and he
disputes the district court's imposition of the 20-year
mandatory minimum sentence. Robinson contends in
particular that the Western District of Pennsylvania was an
improper venue because the jury may have convicted him
for his participation in a conspiracy in Ohio without finding
that he or any co-conspirator committed an overt act in
furtherance of the conspiracy in the Western District of
Pennsylvania. He also argues that section 841(b)(1)(C)
requires a 20-year mandatory minimum only if a court
finds that the distribution of the substance was in the
common law sense the proximate cause of death or serious

bodily injury. Accordingly, even though Robinson acknowledges that a user of the heroin he supplied died from its use, he challenges the sentence because the district court did not make a finding that his conduct was a proximate cause of the user's death.

The district court rejected Robinson's challenge to venue in a motion for judgment of acquittal after discharge of jury. At the conclusion of the sentencing hearing, the district court found that Bettina Allison died of a heroin overdose from heroin that Robinson delivered to Ronald Bungar, who in turn delivered it to Allison and her boy-friend, Michael Minchoff. Thus, the court found that the 20-year mandatory minimum sentence was required.

We conclude that Robinson waived his objection to venue by failing to raise the issue before the jury reached a verdict and that in any event venue was proper. We further conclude that Congress did not intend the phrase "if death or serious bodily harm results from the use of such substance" in section 841(b)(1)(C) to require a showing that the defendant's distribution of the substance in a common-law sense proximately caused a death. Moreover, we hold that the court's well-supported findings show that there was a sufficient nexus between the substance and the death to require the imposition of the mandatory minimum sentence. In the circumstances, we will affirm.1

II. FACTUAL AND PROCEDURAL HISTORY

A. Factual History

On November 29, 1995, Melvin Robinson sold three-eighths of a gram of heroin to Ronald Bungar in Youngstown, Ohio. Robinson was a long-time heroin addict,

_____

1. We have jurisdiction under 28 U.S.C. S 1291 and 18 U.S.C. S 3742, and the district court had original jurisdiction based on 28 U.S.C. S 3231. Although Robinson also challenges the district court's finding of "relevant conduct," and argues that a failure to read a proximate cause requirement into the text of section 841(b)(1)(C) would violate various constitutional provisions, we only will discuss his venue and proximate cause arguments since we find that these other contentions clearly lack merit.

who over the years had cultivated a relationship with a group of addicts from Greenville, Pennsylvania, including Bungar and Michael Minchoff. Often one addict would make the 45-minute trip from Greenville to Youngstown for a small amount of heroin to share with or sell to another user in Greenville.

On November 29, Bungar made the trip to Robinson's Youngstown home with his girlfriend, Dolores Tofani. Bungar earlier had agreed to purchase three $20 (one-eighth ounce) packets of heroin for Minchoff and his girlfriend, Bettina Allison. Once his guests arrived, Robinson left the house to purchase a small amount of heroin for Bungar that Bungar then shared with Tofani and Robinson. Later, Bungar purchased three packets of heroin for Minchoff from Robinson. Bungar delivered these three packets to Minchoff and Allison when he returned to Greenville.

While Bungar and Tofani were at Allison's apartment, Allison began preparing for injection the heroin Bungar had bought from Robinson. Meanwhile, Minchoff injected a "speed-ball"[2] from Robinson's heroin and some cocaine Bungar had obtained earlier. After about 15 minutes, Bungar and Tofani left Allison's apartment and they never saw Allison or Minchoff alive again. Bettina Allison died of a heroin overdose sometime between 1:00 a.m. and 5:00 a.m. on November 30, 1995, and Minchoff died of a heroin overdose sometime later that day or within the next few days.

B. Procedural history

On April 16, 1997, a grand jury in the Western District of Pennsylvania indicted Robinson for conspiring to distribute heroin in violation of 21 U.S.C. S 846 and 21 U.S.C. S 841. Robinson was arrested in Ohio and was transported to the Western District of Pennsylvania where he was arraigned and counsel was appointed to represent him. A jury trial began on July 21, 1997, and at the close of the government's case, Robinson unsuccessfully orally

---

2. A "speed-ball" is the street term for the often dangerous mixture of equal parts cocaine and heroin.

4

moved for judgment of acquittal in a motion which did not challenge venue. On July 24, 1997, the jury returned a verdict of guilty. On July 29, 1997, Robinson moved for a judgment of acquittal on the grounds, insofar as germane here, that the court lacked jurisdiction over the case because of the alleged venue defect. The district court denied the motion on July 31, 1997.

The court held sentencing hearings on April 16, 1998, and May 7, 1998. It concluded that Robinson distributed heroin that resulted in Allison's, but not Minchoff 's, death. Thus, section 841(b)(1)(C) required a mandatory minimum 20-year sentence which the court accordingly imposed by reason of Allison's death. While the court determined that the applicable sentencing range was 235-293 months under the Federal Sentencing Guidelines, in view of its imposition of the 20-year sentence the range was not material.

Inasmuch as the court's findings and conclusions at the sentencing hearing are important we quote them at length:

> One: Defendant engaged in a conspiracy with other persons, including Ronald Bungar, from on or about November 29th, 1995, to on or about November 30, 1995, to distribute and possess with the intent to distribute less than 100 grams of a mixture and substance containing a detectable amount of heroin.
>
> Two: Defendant on multiple occasions prior to November 29, 1995, had delivered drugs to Bungar, which drugs were delivered to others in Defendant's presence.
>
> Three: During the operation of the conspiracy, Defendant obtained heroin from an unknown source and co-conspirator in Ohio which Defendant delivered to Bungar.
>
> Four: The heroin obtained by Bungar from Defendant was of high purity.
>
> Five: During the operation of the conspiracy, Defendant and Bungar and Dolores Tofani used a portion of the drugs delivered while at the Defendant's residence and in Defendant's presence.

5

Six: During the operation of the conspiracy, Bungar and Tofani, with the Defendant's knowledge, left the Defendant's residence with some of the heroin that Bungar had obtained from Defendant. And Bungar delivered part of that heroin to Bettina Allison and Michael Minchoff at Allison's apartment in Greenville, Pennsylvania.

Seven: Bungar and Tofani remained at Allison's apartment for approximately 10 to 15 minutes.

Eight: During that 10- to 15-minute period, Minchoff injected some of the heroin in, quote, speed ball, unquote, form. That is, combined with cocaine while in the presence of Bungar and Tofani.

Nine: During the aforementioned 10- to 15-minute period, Bungar and Tofani observed Allison preparing some of the heroin in question for injection.

Ten: Based upon their previous drug dealings, it was reasonably foreseeable to Defendant that Bungar would deliver these drugs to others.

Eleven: The delivery of the heroin by Bungar to Minchoff and Allison was in furtherance of the conspiracy of which Defendant was a member, within the scope of the Defendant's agreement and reasonably foreseeable in connection with the criminal activity the Defendant agreed to undertake.

Twelve: Allison was never seen alive again after Bungar and Tofani left her apartment in the early morning hours of November 30, 1995.

Thirteen: Various persons spoke with Minchoff over the telephone on November 30, 1995.

Fourteen: Michael Minchoff was seen alive throughout the day and early evening of November 30, 1995, in Greenville, Pennsylvania.

Fifteen: On December 2nd, 1995, officers with the Greenville-West Salem police department, responding to reports that Allison had missed two consecutive workdays without reporting, found the bodies of Allison and Minchoff in Allison's apartment.

Sixteen: The approximate time of the death of Allison was between 1 a.m. and 5:15 a.m. on November 30th, 1995; and the approximate time of death of Minchoff was between 9 p.m. on November 30th, 1995, and 9:45 a.m. on December 2nd, 1995.

Seventeen: The December 2nd, 1995, autopsy performed on the body of Allison confirmed that she died from a heroin overdose and that she also had cocaine, codeine, ethanol, and cannobinoids present in her blood.

Eighteen: An autopsy performed on the body of Minchoff on December 2nd, 1995, confirmed that he also had died of a heroin overdose.

Nineteen: The death of Allison was caused by a heroin overdose as a result of the heroin delivered to her by Bungar during the operation of the conspiracy.

Twenty: The death of Minchoff was caused by a heroin overdose resulting in whole or in part from the heroin delivered to him by Bungar during the operation of the conspiracy.

The Court finds that in accordance with the above findings of fact, the Government has proved by clear and convincing evidence that the death of Bettina Allison resulted from the heroin which Defendant delivered to Ronald Bungar.

With regard to the death of Michael Minchoff, however, the Court finds that the Government has failed to prove by clear and convincing evidence that Minchoff 's death resulted in whole or in part from the heroin which Defendant delivered to Ronald Bungar.

Accordingly, the Court finds that application of the death enhancement set forth in Section 2D1.1(a)(2) of the United States sentencing guidelines imposing a base offense level of 38 is appropriate.

Furthermore, the Court finds that Defendant is subject to a minimum term of imprisonment of 20 years in accordance with Title 21 of the United States Code, Section 841(b)(1)(C).

Robinson filed a motion to correct the sentence on May 8, 1998, that the court denied on May 11, 1998. This appeal followed.

## III. DISCUSSION

### A. Venue

We address Robinson's venue argument first.[3] On this point we are exercising plenary review, as we are deciding the point through the application of legal principles. Article III, Section 2, Clause 3 of the Constitution, provides that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." The Sixth Amendment repeats this requirement: "In all criminal prosecutions, the accused shall enjoy the right to .. . trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . ." Following these requirements, the Federal Rules of Criminal Procedure mandate that "the prosecution shall be had in a district in which the offense was committed." Fed. R. Crim. P. 18. Finally, Congress has provided that "any offense . . . begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. S 3237.

Notwithstanding the foregoing provisions, we have recognized that a defendant can waive the provision for an appropriate venue by not raising a timely contention that venue was mislaid. See United States v. Polin, 323 F.2d 549, 556-57 (3d Cir. 1963); United States v. Gallagher, 183 F.2d 342, 346-47 (3d Cir. 1950). The government argues that Robinson waived any objection to venue by not raising it before the completion of the government's case in chief. However, we have held that a defendant's failure to object before the government rests only constitutes a waiver if the defect in venue is clear on the face of the indictment. See United States v. Turley, 891 F.2d 57, 61 (3d Cir. 1989).

_____

3. While Robinson speaks in terms of a challenge to jurisdiction, clearly venue and not jurisdictional questions are involved here. See e.g., United States v. Polin, 323 F.2d 549, 556 (3d Cir. 1963).

Where, as here, the offense described in the indictment is a conspiracy that allegedly was completed in the district in which the government is prosecuting the defendant, a defect in venue may not be clear on the indictment's face, and would become clear only once the government rests its case. Therefore, we have held that "where there is a proper allegation of venue in the indictment, but the government fails to prove that allegation at trial, a challenge to venue in a motion for acquittal is timely." United States v. Sandini, 803 F.2d 123, 127 (3d Cir. 1986). Thus, Robinson could have timely objected to venue at the close of the government's case, and was not required to object before the close of the government's case. Id.

Robinson contends that under Sandini he sufficiently preserved his objection to venue in his motion for judgment of acquittal five days after the jury announced its verdict. We, however, agree with the Courts of Appeals for the First and Fifth Circuits that a defendant must raise the issue of improper venue before the jury returns a verdict. See United States v. Parrish, 736 F.2d 152, 158 (5th Cir. 1984) (per curiam) ("Thus, the courts have consistently ruled that a claim of venue must be raised at least prior to a verdict."); United States v. Cordero, 668 F.2d 32, 44 (1st Cir. 1981) (same). Therefore, by raising the issue for thefirst time after the jury reached a verdict, Robinson waived any objection to venue.

However, even if we were to find that Robinson timely challenged venue, we would reject his argument. The United States can bring a prosecution in any district where a conspiracy was begun, continued, or completed. See 18 U.S.C. S 3237(a). It is undisputed that Bungar delivered the heroin he acquired from Robinson to Minchoff and Allison in the Western District of Pennsylvania.

To establish a conspiracy, the evidence must show that the alleged conspirators shared a unity of purpose, an intent to achieve a common goal, and had an agreement to work together to achieve that goal. See United States v. Powell, 113 F.3d 464, 467 (3d Cir.), cert. denied, 118 S.Ct. 454 (1997). Here, the evidence established that Robinson and Bungar had a relationship based upon the use and distribution of heroin. Bungar estimated at trial that

9

Robinson had sold him heroin approximately 80 or 90 times during this relationship. After purchasing heroin from Robinson, Bungar sometimes finished it at Robinson's house but at other times he left with heroin to share with or sell to others in Greenville, Pennsylvania.

The events of November 29, 1995, were consistent with Bungar's and Robinson's earlier dealings. Bungarfirst shared a small amount of heroin with Robinson and Tofani. He then purchased three more packets of heroin. Robinson recognized that the heroin was strong, and that Bungar's purchase of three more packets was consistent with an intent to distribute it, as Bungar had often done. Together, Robinson and Bungar were connected in the purpose of distributing heroin to others in Greenville, so that they could continue to supply their own needs.

Finally, it is clear that the court and both parties focused the jury on the distinction between a conspiracy and a buyer/seller agreement. Both the government and Robinson spent considerable time explaining the difference between the two types of agreements, and the district court correctly charged the jury on the matter. In fact, the jury asked for and received clarification of the court's instruction regarding a buyer/seller agreement. In view of all the circumstances, it is clear that the government established that there were overt acts in furtherance of the conspiracy in the Western District of Pennsylvania so venue properly was laid there.

B. The "results from" language of sectio n 841(b)(1)(C)

Our review of a district court's rulings on sentencing matters concerning the interpretation of a statute requiring a mandatory minimum sentence is plenary. See United States v. Collado, 975 F.2d 985, 990 (3d Cir. 1992). Here, we exercise plenary review because, notwithstanding Robinson's challenge to the sentence, he concedes "that clear and convincing evidence proves that but for the use of heroin that Robinson delivered to Bungar, Allison would not have died." Br. at 15. Robinson argues that for section 841(b)(1)(C) and what he contends are the relevant sentencing guideline provisions to apply, the government needs to show that his conduct was the proximate cause of

10

Allison's death. Robinson asks us to remand to the district court for resentencing using this standard.

We have two preliminary observations on the sentencing issue. First, it is not clear to us why the district court's findings with respect to Minchoff led it to conclude that the mandatory minimum sentence was not applicable by reason of his death. Second, even though the government does not contend that the district court made a proximate cause finding with respect to Allison's death, it seems to us that its findings certainly came quite close to satisfying that standard. Nevertheless, we take the case on the basis the parties present it, that only Allison's death is involved and proximate cause was not established.

Although we have not decided the sentencing issue, the Court of Appeals for the Fourth Circuit in United States v. Patterson, 38 F.3d 139 (4th Cir. 1994), held that section 841(b)(1)(C) imposes no "reasonable foreseeability of death" requirement. 38 F.3d at 145.4 In the circumstances, there can be no question but that if we adopt Robinson's position we must reject Patterson.

Patterson held that the "plain language" of section 841(b)(1)(C) neither requires nor indicates that a district court must find that death resulting from the use of a drug distributed by a defendant was a reasonably foreseeable event. Id. The court explained that the "statute puts drug dealers and users on clear notice that their sentences will be enhanced if people die from using the drugs they distribute. . . . Where serious bodily injury or death results from the distribution of certain drugs, Congress has elected to enhance a defendant's sentence regardless of whether the defendant knew or should have known that death would result." Patterson, 38 F.3d at 145. The Patterson court then explained that it would "not second-guess this unequivocal choice." Id.

_____

4. The court declined to decide whether section 841(b)(1)(C) includes an intervening or superseding cause exception to the application of its enhancement since it upheld the district court'sfinding that there was no intervening or superseding cause of death. Id. at 146. There was no intervening or superseding cause here either.

11

We will not either. After all, our role is to "give effect to Congress's intent." Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197, 202 (3d Cir. 1998). Where, as here, Congress' language is "plain and unambiguous," we simply apply the language of the statute as written. Here, the conspiracy was to distribute heroin. Thus, Robinson was subject "to the same penalties as those prescribed for the offense, the commission of which was the object of the . . . conspiracy." 21 U.S.C. S 846. Under section 841(b)(1)(C), in a distribution of heroin case "if death or serious bodily injury results from the use of such substance" a minimum 20-year sentence was required.

It is absolutely clear under the district court's unassailable findings that, in the course of the conspiracy Robinson delivered the drugs to Bungar, and that in furtherance of the conspiracy Bungar delivered the drugs to Allison. It was reasonably foreseeable to Robinson that Bungar would deliver the drugs to someone else, and it is indisputable that Allison's death was, in the words of the district court, "caused by a heroin overdose as a result of the heroin delivered to her by Bungar during the operation of the conspiracy." In the circumstances, it would be sophistry to say that Allison's death did not result from the use of the heroin delivered pursuant to the conspiracy.

Robinson relies on Chief Judge Becker's concurring and dissenting opinion in United States v. Neadle, 72 F.3d 1104, amended, 79 F.3d 14 (3d Cir. 1995), to argue that the statutory language is ambiguous. In interpreting the sentencing guidelines, Judge Becker stated that"the plain meaning of `resulted from' connotes causation" and that "[t]he notion of causation runs throughout the law -- including the criminal law -- and it is generally understood to encompass two concepts. A defendant's conduct generally must be both the `cause in fact' and the `proximate cause' of some harm before liability is imposed." Id. at 1115, 1119. In this case, however, unlike in Neadle, we are not dealing with the application of intricate provisions of the sentencing guidelines to calculate a financial loss. Rather, we are applying a statute dealing with a discrete problem, the distribution of controlled substances, products which Congress recognized will in

12

some cases cause death or serious bodily injury. In short, Congress recognized that the risk is inherent in the product and thus it provided that persons who distribute it do so at their peril. It is obvious Congress intended in such a case that the 20-year mandatory minimum would apply if death or serious bodily injury resulted from the use of the substance without regard for common law proximate cause concepts.5

In reaching our result, we point out that the sentencing guidelines have limited relevancy here. While it is true that the court established a guidelines range and imposed a sentence within that range, in fact the court fixed the sentence without regard for that range as it imposed the statutory mandatory minimum sentence.

We also observe that U.S.S.G. S 1B1.3(a)(3), which Robinson cites, is completely consistent with our result. Under that section, relevant conduct with respect to factors determining sentencing range include all "harm that resulted from the acts and omissions specified" in U.S.S.G. S 1B1.3(a)(1)(B). Section 1B1.3(a)(1)(B) includes as relevant conduct in a "jointly undertaken criminal activity . . . whether or not charged as a conspiracy[ ] all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." Here, of course, Bungar's distribution of the heroin to a third party was not merely reasonably foreseeable by Robinson. After all, the evidence we describe above shows that Robinson intended that it be distributed for its distribution was the very purpose of the conspiracy. To the extent, therefore, that section 1B1.3(a)(3) is implicated here, there can be no doubt that it is satisfied.

We recognize that in some cases it is possible that the death or serious bodily injury which "results from the use of a [controlled] substance" may be so remote a consequence from the criminal conduct of the defendant with respect to the substance that a court might conclude

_____

5. We are not concerned here with cases calculating the total quantity of drugs in a conspiracy attributable to a particular defendant. See e.g., United States v. Collado, 975 F.2d 985 (3d Cir. 1992). There is no question but that Robinson was the source of the heroin involved here.

that it would not be consistent with congressional intent to apply the mandatory 20-year minimum sentence. Wherever, if anywhere, that line might be is of no concern to us now. In this case, Robinson conspired to distribute the heroin and a person to whom it almost immediately was distributed consumed it and died as a result. Surely, here the mandatory minimum sentence is applicable. Accordingly, this case does not require us to consider whether there is or should be a principled way to limit the application of section 841(b)(1)(C) when cause in fact is established.

In this regard, we reiterate that the district court's findings in this case came close to satisfying a proximate cause standard. Indeed, if they did not, it was only because the court did not make a finding that it was foreseeable that Allison or another consumer of the heroin might suffer death or serious bodily injury from it. Yet, it cannot have been the intent of Congress to require such a finding as a condition of a mandatory minimum sentence being applicable under sections 841(b)(1)(C), for surely what concerned Congress was the inherent risk from the use of controlled substances. Plainly, if we read a particularized foreseeability requirement into that section, we would limit the applicability of the section significantly and frustrate Congress' intent. If section 841(b)(1)(C) is not to be applied as presently written, Congress and not this court should narrow its application.

IV. CONCLUSION

For the foregoing reasons, the judgment of conviction and sentence will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

14